UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | | |
|---|---|---|
| TERRI L. ROSANE, | ) | CIV. 11-5020-JLV |
| | ) | |
| Plaintiff, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| vs. | ) | **ON DEFENDANT'S MOTION FOR** |
| | ) | **SUMMARY JUDGMENT** |
| SHANNON COUNTY SCHOOL DISTRICT | ) | [DOCKET NO. 56] |
| 65-1, | ) | |
| | ) | |
| Defendant. | ) | |

## INTRODUCTION

Plaintiff Terri L. Rosane is a former employee of the Batesland School, which is located within Shannon County School District 65-1 ("the School District"). See Docket No. 1. She filed this lawsuit against her former employer alleging unlawful employment practices. Id. The School District moves for summary judgment on the grounds that Ms. Rosane did not exhaust administrative remedies, has not met the *prima facie* cases of her claims, and that the School District is immune from suit. See Docket No. 57. Plaintiff argues that genuine issues of material fact preclude the grant of summary judgment for the School District. See Docket No. 62.

Jurisdiction is proper in federal court based on the presence of a federal question under 28 U.S.C. § 1331. The Chief District Court Judge, the Honorable Jeffrey L. Viken, referred defendant's motion to this magistrate judge for a recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(A). See Docket No. 65.

1

**FACTS**

**A.    Work Environment at the Batesland School**

Terri Rosane worked at the Batesland School in South Dakota beginning in October 2007.  Docket No. 1 at 2.  Ms. Rosane is Caucasian.  Docket No. 67 at ¶ 1.  She held various positions in the kitchen, including breakfast cook, baker, and cook.  Docket No. 64-2 at 12:1-8.  When Ms. Rosane started and throughout her time at Batesland School, Bertha Conroy was head cook.  Id. at 12:9-14; Docket No. 67 at ¶ 3.  Pete Plenty Wounds later worked in the kitchen as well.  Docket No. 64-2 at 12:15-23.  Ms. Conroy and Mr. Plenty Wounds are Native American; their first language is Lakota and their second language is English.  Docket No. 62 at 1; Docket No. 67 at ¶ 4.

Ms. Rosane was supervised by Connie Kaltenbach, the school principal (prior to Ms. Kaltenbach, Wayne Goff was the principal) and Carol Reitz, the food supervisor.  Docket No. 56-4 at 21:12-23.  Ms. Kaltenbach and Ms. Reitz are both Caucasian.  Docket No. 56-7.  Ms. Rosane considered Ms. Conroy to be her supervisor as well.  According to Michael Brubaker, the Shannon County Classified Education Association representative, "Bertha believed . . . herself to be the supervisor to anyone and everyone who walked into that kitchen."  Docket No. 64-6 at 18:3-9.

Ms. Rosane kept a work-related journal beginning in October 2006 (the parties have agreed that Ms. Rosane's employment at Batesland School lasted

2

from 2007 to 2010, but journal entries in 2006 reference Carol Reitz and Bertha Conroy). <u>See</u> Docket 56-9; Docket No. 67 at ¶ 1. The journal entries detail Ms. Rosane's perception of her interactions in the kitchen, particularly with Ms. Conroy and Mr. Plenty Wounds. <u>See generally</u> Docket No. 56-9. The last entry is for October 6, 2009. <u>Id.</u> at 14-15.

Beginning in the summer of 2008, Ms. Rosane alleges that she experienced severe hostility from Ms. Conroy and Mr. Plenty Wounds. Docket No. 62 at 2. According to Ms. Rosane, Mr. Plenty Wounds and Ms. Conroy spoke Lakota in the kitchen and would not speak to her. <u>Id.</u> at 4. Due to their body language, she believed they were talking about her. <u>Id.</u> at 2. Ms. Rosane claims that Ms. Conroy stole her recipes and intentionally failed to tell her about a change in their start time (6:30 a.m. to 7:00 a.m.), changes in the menu, and a co-worker's birthday party. <u>Id.</u> at 3. Ms. Rosane alleges that at various times Ms. Conroy berated and ignored her. <u>Id.</u>

Ms. Rosane also reports that various statements made by Mr. Plenty Wounds and Ms. Conroy caused her distress. She claims that she overheard them refer to her as "the white woman." <u>Id.</u> at 4. Mr. Plenty Wounds allegedly told Ms. Rosane that there are "[N]atives in this school system that are prejudice[d] against white people." <u>Id.</u> at 3. Ms. Conroy allegedly commented that white teachers at the school were "here for the money, not for the kids." <u>Id.</u> When discussing the possibility of working at summer school at

another school, Wolf Creek, Ms. Conroy allegedly told Ms. Rosane it was a bad idea, stating "they would run [Rosane] out," similar to how Ms. Conroy "could run [Rosane] out of Batesland if she didn't like [her]" because Ms. Rosane was the only white employee in the School District's kitchens.  Id. at 4.

In summer 2009, at the beginning of the school year, Mr. Plenty Wounds and Ms. Conroy told the school principal, Connie Kaltenbach, that they had been called "F--ing Indians," allegedly by Ms. Rosane or her husband, Rob Rosane.  See Docket No. 57 at 2; Docket No. 56-8 at 1.  Ms. Rosane denied ever making such a comment, to which Ms. Conroy allegedly responded "Well, if you can go around saying 'F Indians,' I can go around saying 'F white people.' " Docket No. 56-9 at 3.  Ms. Conroy also told Ms. Kaltenbach that Mr. Rosane frequently glared at Ms. Conroy and Mr. Plenty Wounds and drove in circles around the school.  Docket No. 56-8 at 1.

Later that summer, Ms. Rosane overheard Mr. Plenty Wounds and Ms. Conroy planning to report the "F--ing Indians" remark to a supervisor, the school board, and a police officer if necessary.  See Docket No. 56-4 at 67:8-18; Docket No. 62 at 5.  This caused Ms. Rosane to vomit and become very upset; she left school early that day.  See Docket No. 56-4 at 67:19-68:1.

## B.    Filing of Grievance and Administrative Complaint

Terri and Rob Rosane sought advice from Michael Brubaker (the Classified Education Association representative).  Docket No. 62 at 6.

Mr. Brubaker contacted Terry Albers, the Human Resources director at the Batesland School, concerning Ms. Rosane's complaints about the kitchen working environment. Docket No. 57 at 2. On September 1, 2009, Mr. Albers held a fact-finding meeting to attempt to find a solution to the working environment in the kitchen. Docket No. 57 at 3. Ms. Kaltenbach, Mr. Albers, Ms. Reitz, Ms. Conroy, and Mr. Plenty Wounds were present at this meeting. Id. Ms. Reitz and Ms. Kaltenbach believed at the time that the meeting concerned Ms. Rosane's alleged negative treatment of Native Americans and recent problems with milk tray counts in the lunchroom. Id. Neither supervisor had received a complaint from Ms. Rosane at the time of this first fact-finding meeting. Id.

On September 3, 2009, Mr. Albers held another fact-finding meeting, this time with Ms. Reitz, Mr. Brubaker, Mr. Rosane, and Ms. Rosane. Id. Ms. Rosane requested that the only language spoken in the kitchen be English. Id. It was decided that Mr. Albers would host a conflict resolution session with the three members of the kitchen staff: Ms. Rosane, Ms. Conroy, and Mr. Plenty Wounds. Id. at 4.

The conflict resolution meeting took place on September 8, 2009. Mr. Albers asked the kitchen staff what they would like changed in the kitchen. Id. Mr. Albers testified that Ms. Rosane did not mention discrimination at the conflict resolution meeting, nor did she share that she believed the others to be

speaking about her in Lakota.  See Docket No. 56-10 at 30:6-10.  Mr. Albers proposed a monetary incentive for Mr. Plenty Wounds to teach Ms. Rosane Lakota words.  Id. at 30:13-32:10.  Ms. Conroy declined to participate in this plan.  Id.

On September 9, 2009, Ms. Rosane went to work at Batesland School. See Docket No. 62 at 8.  She alleges that she tried to learn some Lakota words from Mr. Plenty Wounds, that Ms. Conroy ignored her, and that Mr. Plenty Wounds and Ms. Conroy continued to speak Lakota.  Id.  Beginning on September 10, 2009, Ms. Rosane went on sick leave.  Id.  Ms. Rosane submitted slips from her nurse practitioner requesting that she remain on sick leave until October 22, 2009.  See Docket Nos. 56-15; 56-16; 56-20.

Ms. Rosane filed a formal grievance with the school district on September 18, 2009.  The grievance lists "date of occurrence" as September 9, 2009, and states:  "Ms. Rosane has, on multiple occasions, stated that she is being discriminated against in the workplace of the Batesland School."  Docket No. 56-17.  Ms. Rosane requested that "[c]orrections shall be made in the cafeteria of Batesland School so that the grievant is no longer discriminated against nor mentally abused in the place of wor[k]."  Id.  The grievance does not use the word "race," but Ms. Rosane argues that she has always believed the alleged treatment toward her was due to race.  See Docket No. 62 at 9.

On September 24, 2009, Superintendent Dan Elwood decided that an "involuntary transfer" pursuant to School District policy would benefit both Ms. Rosane and the School District. See Docket No. 56-21. Ms. Rosane signed a memorandum stating that a transfer to Wolf Creek School would be effective on October 5, 2009, but later declined the transfer. Id.

On September 28, 2009, Supt. Elwood wrote Ms. Rosane a letter detailing the School District's investigation of Ms. Rosane's initial oral complaint and later written grievance. See Docket 56-22. The agreement that Mr. Plenty Wounds would teach Ms. Rosane Lakota words was never implemented due to Ms. Rosane's sick leave. Id. at 2. That agreement was deemed null and void due to the filing of the written complaint. Id. Supt. Elwood detailed the methods of investigation and noted that Mr. Brubaker had the opportunity to interview witnesses and parties. Id. Supt. Elwood wrote:

> The investigation concluded that there is no law or regulation requiring that individuals employed at Shannon County School District speak only English in the workplace. Mr. Albers further concluded that the use of Lakota language in the workplace in this instance was not done for the purpose of harassing, bullying, or discriminating.

Id. Supt. Elwood noted that Ms. Rosane had not provided "concrete, particularized allegations," despite the request for more information. Id. at 3. The School District concluded that Ms. Rosane's allegations were unsubstantiated, but allowed her until October 6, 2009, to submit additional information. Id. If she declined to provide information or request an extension,

7

Supt. Elwood informed her that he would issue the investigative report and submit it to the board.  Id.

Supt. Elwood wrote Ms. Rosane and Mr. Brubaker another letter on October 9, 2009.  Docket No. 56-23.  The School District granted Ms. Rosane's request for additional time to provide documentation, giving her until October 16, 2009.  Id.  The School District retained a third party to conduct the remainder of the investigation into Ms. Rosane's grievance.  Id.  Ms. Rosane claims that the School District's third party investigator did not allow her more time to decide whether she wanted to be interviewed with Mr. Brubaker present.  See Docket No. 62 at 10, 21.  Because Ms. Rosane declined the involuntary transfer, Mr. Elwood informed her that no further action would be taken on the involuntary transfer, but offered her a voluntary transfer at the termination of her medical leave status.  Docket No. 56-22 at 2.  Supt. Elwood explained that the School Board would not consider the grievance until the completion of the investigation and the final determination by the School District.  Id.

On October 14, 2009, Ms. Rosane filed a Charge of Discrimination with the South Dakota Division of Human Rights ("SDDHR").  Docket No. 56-24.  She checked the boxes for race and retaliation, alleging that the involuntary transfer to Wolf Creek was in retaliation for filing a grievance.  Id.  Mr. Brubaker discontinued his efforts on the School District grievance because

the Rosanes told him they wanted to proceed with the SDDHR Charge and did not want to proceed with the School District grievance. <u>See</u> Docket No. 56-13 at 74:13-19; 122:11-18.

The School District granted Ms. Rosane's request for leave without pay until she notified the School District that she wanted to return to work or until the completion of the investigation. Docket No. 64-10. Ms. Rosane alleges that she did not receive any response from Supt. Elwood to her January 19, 2010, request to come back to work and for the School District to install audio and video recorders in the kitchen. Docket No. 62 at 11.

Ms. Rosane began working at the Gordon Hospital on January 22, 2010. Docket No. 56-4 at 112:12-15. Ms. Rosane alleges that she wrote to Supt. Elwood on March 25, 2010, requesting information on the status of her grievance. Docket 62 at 11. Supt. Elwood wrote Ms. Rosane a letter on April 1, 2010, stating that the School District would recommend that she be terminated at the next school board meeting. Docket No. 56-29. He expressed concern that Ms. Rosane had misrepresented her health situation and received benefits for over three months while she was able to work. <u>Id.</u>

On February 11, 2010, SDDHR issued a determination of no probable cause and dismissed Ms. Rosane's charge. Docket No. 56-25. When Ms. Rosane appealed the SDDHR determination, the EEOC adopted the findings of SDDHR and issued a notice of right to sue. Docket No. 56-26.

**C.     School District's Statement of Undisputed Material Facts and Ms. Rosane's Responses**

In support of its motion for summary judgment, defendant School District set forth a statement of 48 allegedly undisputed material facts.  Docket 58.  Ms. Rosane responded to this statement.  Docket No. 63.

Ms. Rosane disputes any of School District's attempts to paraphrase and seeks to explain the context of the facts.  Id.  For example, School District set forth the following statement:  "Plaintiff was absent from work on September 10, 2009 and September 11, 2009."  Docket No. 58 at ¶ 23.  Ms. Rosane responded:  "Admit that Plaintiff was absent from work for health reasons on the dates specified."  Docket No. 63 at ¶ 23.

Ms. Rosane denies in part the statement that the school principal and the food service supervisor were her supervisors, adding that Ms. Conroy also supervised her kitchen duties.  Id. at ¶ 5.  In response to School District's statement that "Plaintiff was never disciplined for any issues relating to her job performance; she was not suspended from job duties; she was not demoted; she was not transferred; she did not receive a wage cut," Ms. Rosane adds that the School District initiated an involuntary transfer.  Id. at ¶ 9.  Plaintiff also disputes that the School District's stated reasons for initiating the involuntary transfer were genuine.  Id. at ¶  26.

In response to the statement that Ms. Conroy and Mr. Plenty Wounds spoke English during the day, Ms. Rosane asserts that on occasion Ms. Conroy

and Mr. Plenty Wounds spoke Lakota the entire day.  Id. at ¶ 13.  Further, in response to School District's statement that "[p]laintiff told them it did not bother her" when Ms. Conroy and Mr. Plenty Wounds spoke Lakota, Ms. Rosane asserts that at first she did not mind, but she began to mind when Ms. Conroy made menu changes and the two talked about her in Lakota.  Id. at ¶ 14.  The School District states that Ms. Rosane was able to perform her job duties throughout the course of her employment.  Docket No. 58 at ¶ 48. Ms. Rosane disputes this fact, stating that she "became physically ill, vomited at work, and had to take an extended sick leave and be put on anti-anxiety medications."  Id. at ¶ 48.  The School District filed a reply to Ms. Rosane's response, maintaining that there is no genuine issue of material fact in dispute.  Docket No. 67.

## DISCUSSION

**A.     Summary Judgment Standard**

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate where the moving party "shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The court must view the facts, and inferences from those facts, in the light most favorable to the nonmoving party.  See Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655

(1962)); <u>Helton v. Southland Racing Corp.</u>, 600 F.3d 954, 957 (8th Cir. 2010).

Summary judgment will not lie if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party.

The burden is placed on the moving party to establish both the absence

of any genuine issue of material fact and that the moving party is entitled to

judgment as a matter of law. FED. R. CIV. P. 56(a). Once the movant has met

its burden, the nonmoving party may not simply rest on the allegations in the

pleadings, but must set forth specific facts, by affidavit or other evidence,

showing that a genuine issue of material fact exists. <u>Anderson v. Liberty

Lobby, Inc.</u>, 477 U.S. 242, 256 (1986); FED. R. CIV. P. 56(e)(each party must

properly support its own assertions of fact and properly address the opposing

party's assertions of fact, as required by Rule 56(c)).

The underlying substantive law identifies which facts are "material" for

purposes of a motion for summary judgment. <u>Anderson</u>, 477 U.S. at 248.

"Only disputes over facts that might affect the outcome of the suit under the

governing law will properly preclude the entry of summary judgment. Factual

disputes that are irrelevant or unnecessary will not be counted." <u>Id.</u>; <u>see also</u>

10A Charles A. Wright, Arthur Miller, & Mary Ann Kane, FEDERAL PRACTICE AND

PROCEDURE § 2725, pp. 93-95 (1983)). "[T]he mere existence of *some* alleged

factual dispute between the parties will not defeat an otherwise properly

supported motion for summary judgment; the requirement is that there be no

*genuine* issue of *material* fact." <u>Anderson</u>, 477 U.S. at 247-48 (emphasis in original).

Essentially, the availability of summary judgment turns on whether a proper jury question is presented: "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." <u>Anderson</u>, 477 U.S. at 250. "There is no 'discrimination case exception' to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial." <u>Pye v. Nu Aire, Inc.</u>, 641 F.3d 1011, 1018 (8th Cir. 2011) (citing <u>Torgerson v. City of Rochester</u>, 643 F.3d 1031, 1043 (8th Cir. 2011)).

**B.    Exhaustion of Administrative Remedies**

Ms. Rosane filed this lawsuit alleging violations of Title VII of the Civil Rights Act of 1964 and Title I of the Civil Rights Act of 1991. <u>See</u> Docket No. 1; 42 U.S.C. §§ 2000e-3(a) and 2000e-5(f)(1), (3). Before filing suit in federal court, a Title VII claimant must exhaust administrative remedies. <u>See</u> 42 U.S.C. § 2000e-5(b)-(c). The claimant must file a charge of discrimination either with the EEOC or with the state's Division of Human Rights. <u>See</u> <u>id.</u>

Here, Ms. Rosane elected to file a charge with the South Dakota Division of Human Rights ("SDDHR"). After the filing of an administrative charge,

SDDHR acts in its investigatory capacity.  At the end of the investigatory phase, SDDHR issues a determination of probable cause.  If SDDHR determines that there is no probable cause, this constitutes final agency action.  See SDCL § 20-13-28.1.  At that point, the claimant has two choices.  The claimant can appeal under the South Dakota Administrative Procedures Act, or the claimant can appeal the SDDHR decision to the EEOC.  See 42 U.S.C. § 2000e-5(c)-(e); SDCL § 1-26-30.  If the charging party chooses to file in federal court, she must complete the additional step of obtaining a right-to-sue letter from the EEOC before she may file a complaint in federal court.  42 U.S.C. § 2000e-5(f)(1).

The purpose of administrative exhaustion is to allow the EEOC the opportunity to investigate the possibility of a voluntary resolution without the need for the parties to litigate the dispute.  Parisi v. Boeing Co., 400 F.3d 583, 585 (8th Cir. 2005).  "The proper exhaustion of administrative remedies gives the plaintiff a green light to bring her employment-discrimination claim, along with allegations that are 'like or reasonably related' to that claim, in federal court."  Id. (citing Shannon v. Ford Motor Co., 72 F.3d 678, 684 (8th Cir. 1996)).  When construing whether allegations listed in the complaint are "like or reasonably related" to the administrative charge, federal courts will liberally construe the charge "for exhaustion of remedies purposes," but "there is a difference between liberally reading a claim which lacks specificity, and

inventing, *ex nihilo*, a claim which simply was not made." Id. at 585.  Federal

courts review the determination of probable cause *de novo*.  McDonnell

Douglas Corp. v. Green, 411 U.S. 792, 799 (1973).

On October, 14, 2009, Ms. Rosane filed her Charge of Discrimination

with the SDDHR, checking the boxes for discrimination based on race and

retaliation.  Docket No. 56-24.  At the time, her allegation of retaliation

stemmed from the School District's proposed involuntary transfer to Wolf

Creek.  Id.  On February 11, 2010, SDDHR issued a determination of no

probable cause and dismissed the charge.  Docket No. 56-25.  On appeal, the

EEOC adopted the findings of SDDHR and issued a notice of right to sue.

Docket No. 56-26.  Ms. Rosane received this right-to-sue letter, dated

December 7, 2010, on December 10, 2010.  Docket No. 1.  Ms. Rosane filed

this lawsuit on March 9, 2011, within 90 days of her receipt of the right-to-sue

letter.  See id.

The School District does not dispute that Ms. Rosane exhausted her race

discrimination (hostile work environment) claim.  In support of its motion for

summary judgment, the School District argues that Ms. Rosane has not

exhausted her administrative remedies as to the retaliation claim because her

original charge contemplated the involuntary transfer rather than termination

of employment.  See Docket No. 57 at 9.  In the administrative charge,

Ms. Rosane stated, in relevant part:  "Terry Albers, from Human Resources,

required me to learn Lakota . . . .  After I filed a grievance with the School

Board stating I was being discriminated against because of my race, I was

notified I would be transferred to the Wolf Creek School . . . I believe the

transfer to Wolf Creek is in retaliation for my discrimination complaint."

Docket No. 56-24.  In her federal complaint, Ms. Rosane asserts that the

School District retaliated against her, "by telling her to learn the Lakota

language, threatening to transfer her to another school, failing to investigate

the complaints of Plaintiff, and otherwise creating an intolerable working

environment such that she was forced to resign."  Docket No. 1 at 5.

Accordingly, the issue is whether Ms. Rosane's allegedly retaliatory termination

is "like or reasonably related" to the retaliation claim regarding the proposed

involuntary transfer listed in her administrative charge.

     Following the Supreme Court's decision in <u>National Railroad Passenger</u>

<u>Corporation v. Morgan</u>, the Eighth Circuit has "considerably narrowed" its view

of "like or reasonably related to" analysis, but has not "wholly abandoned the

theory that reasonably related subsequent acts may be considered exhausted."

<u>Compare</u> <u>Richter v. Advance Auto Parts, Inc.</u>, 686 F.3d 847, 852 (8th Cir.

2012); and <u>Wedow v. City of Kansas City, Mo.</u>, 442 F.3d 661, 673 (8th. Cir.

2006); <u>see generally</u> <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101 (2002).

     In <u>Wedow v. City of Kansas City, Missouri</u>, female firefighters specifically

asserted violations of Title VII anti-retaliation provisions and described denials

of assignments and opportunities for promotion when filing their administrative charge in November 1997. <u>Wedow</u>, 442 F.3d at 674. In their complaint, the firefighters then alleged that this retaliation continued from 1998 to 2000, subsequent to filing the administrative charge. <u>Id.</u> The Eighth Circuit characterized this conduct as "ongoing retaliation," noting that forcing the firefighters to file new administrative charges "would create needless procedural barriers." <u>Id.</u> (citing <u>Anderson v. Block</u>, 807 F.2d 145, 148 (8th Cir. 1986)). "[W]here the subsequent retaliatory acts were of a like kind to the retaliatory acts alleged in the EEOC charge," the claims were not barred for failure to exhaust administrative remedies. <u>Id.</u>

In <u>Richter v. Advance Auto Parts, Inc.</u>, a store manager reported fellow employees' misconduct to her supervisor. <u>Richter</u>, 686 F.3d at 849. A few days later, the supervisor told her she had one week to reapply for a position with lower pay and different responsibilities because she had failed to make bank deposits correctly. <u>Id.</u> She filed an administrative charge alleging sex and race discrimination but did not check the box for retaliation. <u>Id.</u> Pursuant to an EEOC "right-to-sue" letter, she filed suit in federal court, alleging that she was terminated in retaliation for filing the administrative charge. <u>Id.</u> Reasoning that the termination constituted a separate actionable employment practice in this case, the Eighth Circuit held that she had not exhausted her administrative remedies on the retaliation claim. <u>Id.</u> at 851. The court noted

that the EEOC never had the opportunity to investigate or initiate a conciliation process on the retaliation claim.  Id. at 853; see also Parisi, 400 F.3d at 584-86 (subsequent failures to rehire were "separate and completed act[s]" rather than a continuing violation reasonably related to the original administrative charge where employee listed one incident of failure to rehire but stated in second amended complaint that he was "repeatedly denied employment").

For the reasons set forth below, the exhaustion of remedies in the instant case more closely resembles Wedow than Richter.  Like the female firefighters in Wedow, Ms. Rosane originally asserted retaliation in her administrative charge.  Ms. Rosane's termination, whether it consisted of resignation or dismissal, is of a "like kind" to a proposed involuntary transfer.  Ms. Rosane did not specify that the retaliation was ongoing.  But as Ms. Rosane notes in her response brief, "it would be impossible for a plaintiff to allege retaliation in the administrative complaint, if the retaliation stemmed from the protected activity of filing the complaint itself."  Docket No. 62 at 14 (citing Foster v. Roberts Dairy Co., 372 F. Supp. 2d 1165, 1173 (D. Neb. 2005)).  Requiring Ms. Rosane to file another administrative charge subsequent to her termination would create "needless procedural barriers."  Wedow, 442 F.3d at 674.  Her retaliation claim relating to her termination is "reasonably related to" her retaliation claim relating to the proposed involuntary transfer.  Ms. Rosane has

exhausted her administrative remedies.  Accordingly, this court will reach the merits of all of her Title VII claims.

## C.    Hostile Work Environment[1]

Under Title VII of the Civil Rights Act of 1964, an employer may not discriminate against an employee "with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1).  The creation of a hostile work environment is one way in which an employer can practice discrimination.  The Supreme Court has defined "hostile work environment" as a workplace "permeated with 'discriminatory intimidation, ridicule, and insult,' " such that it is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  <u>Harris v. Forklift Systems, Inc.</u>, 510

---

[1]In support of its motion for summary judgment, School District discusses three claims:  race discrimination, hostile work environment, and retaliation.  <u>See</u> Docket No. 57 at 30.  Although plaintiff's complaint lists Count 1 as "discrimination on the basis of race," the enumerated paragraphs assert a claim for hostile work environment.  <u>See</u> Docket No. 1 at 2-3.  Hostile work environment is not specifically pled.  <u>See id.</u>  While the *prima facie* cases for race discrimination and hostile work environment overlap somewhat, they involve separate analyses.

Ms. Rosane's response to defendant's motion for summary judgment only asserts a hostile work environment claim.  <u>See</u> Docket No. 62.  Therefore while plaintiff has not specifically denied the existence of a separate race discrimination claim, this court can infer that "Count 1" refers only to a hostile work environment claim.  <u>See</u> Docket No. 1 at 2; Docket No. 62 at 14-27.  Count 2, retaliation, is discussed below within the context of burden-shifting framework.  <u>See generally</u> <u>Pye</u>, 641 F.3d at 1018-20 (<u>McDonnell Douglas</u> employment discrimination burden-shifting framework used for retaliation claims but not for hostile work environment claims).

U.S. 17, 21 (1993) (citing <u>Meritor Savings Bank, FSB v. Vinson</u>, 477 U.S. 57, 65-67 (1986)).

To prevail on her hostile work environment claim, Ms. Rosane must prove unwelcome harassment on account of her race, which was sufficiently severe or pervasive to affect a term, condition, or privilege of her employment. <u>See</u> <u>Bowen v. Missouri Dep't of Social Servs.</u>, 311 F.3d 878, 883 (8th Cir. 2002); <u>Woodland v. Joseph T. Ryerson & Son, Inc.</u>, 302 F.3d 839, 843 (8th Cir. 2000). The parties do not dispute that Ms. Rosane is a member of a protected class. <u>See</u> Docket No. 57 at 15.

### 1. Unwelcome Harassment Based on Race

In her complaint, Ms. Rosane alleges that Bertha Conroy and Pete Plenty Wounds and other employees and agents of School District instigated the following discriminatory conduct against her: "remarks about Plaintiff's race, refusal to interact with her, and threats that she would be run off the reservation. Plaintiff was subject to such conduct because of and on the basis of her race, which was white." Docket No. 1 at 3. Ms. Rosane believed her co-workers were speaking about her when they spoke Lakota. Docket No. 62 at 2-4. Ms. Rosane alleges that at various times Ms. Conroy berated and ignored her, stole her recipes, refused to talk to her or acknowledge her, and failed to tell her about a change in start time. <u>Id.</u> at 3. Ms. Rosane claims that she overheard them refer to her as "the white woman." <u>Id.</u>

Finally, Ms. Rosane claims the following statements amount to race-based harassment:  Mr. Plenty Wounds stated there are "Natives in this school system that are prejudice[d] against white people";  Ms. Conroy stated that she "could run [Rosane] out of Batesland if she didn't like [her] . . . because she was the only white person in the Shannon County School kitchens"; and Ms. Conroy stated:  "Well, if you can go around saying F Indians, I can go around saying F white people."  Id. at 3-4; Docket No. 56-9 at 3.

It is evident that Ms. Rosane did not always get along smoothly with Ms. Conroy and Mr. Plenty Wounds.  It does not necessarily follow that Ms. Rosane was subjected to a hostile work environment.  Refusing to interact with one's coworker or supervisee is not discriminatory on its face.  See e.g., Williams, 223 F.3d at 754 (where female employee asked male supervisor to stop bothering her and he stopped talking to her for two weeks, court noted: "[v]iewed in the light most favorable to [employee], [supervisor's] silent treatment is at most ostracism, which does not rise to the level of an actionable adverse employment action").  Similarly, referring to someone as a "white woman," is facially neutral as the adjective can be used for identification purposes rather than derogatory ones.  Although Ms. Rosane continues to assert that she understood that her coworkers were talking about her when they spoke Lakota, she stated in her deposition that she didn't understand Lakota.  Compare Docket No. 63 at ¶ 39 and Docket No. 56-4 at 75:3-8.

21

Ms. Rosane argues that a teacher who overheard Ms. Conroy speaking Lakota stated "She's just being mean."  Docket No. 56-4 at 75:10-23.

"Not all unpleasant and uncivil conduct creates a hostile work environment."  Bowen, 311 F. 3d at 884; see also Woodland, 302 F.3d at 843; Ross v. Kansas City Power & Light Co., 293 F.3d 1041, 1051 (8th Cir. 2002). But where "epithets carr[y] clear racial overtones, they permit an inference that racial animus motivated not only [] overtly discriminatory conduct but all [] offensive conduct."  Bowen, 311 F.3d at 884.  The statements allegedly made by Mr. Plenty Wounds and Ms. Conroy do give rise to an inference of racial animus.  A reasonable jury could therefore conclude that Ms. Rosane was subject to unwelcome harassment on the basis of her race.  This court must next determine whether that harassment was so "severe or pervasive" that it subjectively and objectively affected Ms. Rosane's employment.

### 2.	Whether Harassment Was So "Severe or Pervasive" that it Affected a Term, Condition, or Privilege of Employment

In her complaint, Ms. Rosane claims "[t]hat the conduct of Conroy and Plenty Wounds, who are both Native Americans, created an intimidating, hostile, and offensive work environment and unreasonably interfered with Plaintiff's ability to perform the duties of her position."  Docket No. 1 at 3. Courts look at the circumstances surrounding the unwelcome harassment to determine whether it affected a term, condition, or privilege of employment and will consider the following factors:

These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required. Harris 510 U.S. at 23; Bowen, 311 F.3d at 884.

In Ross v. Douglas County, Nebraska, the Eighth Circuit affirmed the District Court's entry of judgment on a jury verdict for the plaintiff on his hostile work environment claim. Ross v. Douglas Cnty., Neb., 234 F.3d 391, 393 (8th Cir. 2000). Ross' supervisor frequently referred to him using racial slurs, such as "n----r" and "black boy." Id. The Eighth Circuit noted that testimony at trial established that "[his supervisor] constantly referred to Ross by a racial epithet." Id. at 397.

In Bowen v. Missouri Department of Social Services, the Eighth Circuit reversed the lower court's grant of summary judgment for the employer on an employee's hostile work environment claim. Bowen, 311 F.3d at 880. The Eighth Circuit concluded that Bowen had produced sufficient evidence to preclude summary judgment, noting the progressively hostile nature of her supervisor's conduct. Id. at 885. The conduct which pervaded Bowen's work environment included the comment that she was a "white "b---h," frequent hostile stares by her supervisor, her supervisor's violent act of destroying a cake she had made for her co-workers, the comment that she was a

"menopausal white b---h," the threat of a physical beating, and an incident where her supervisor ran directly at her.  Id.  Bowen's co-workers also warned her that her supervisor "did not like white people" and had threatened to shoot fellow employees.  Id.

Ms. Rosane must demonstrate that the unwelcome harassment was severe or pervasive so as to affect a term, condition, or privilege of her employment under both an objective and subjective standard.  Willis v. Henderson, 262 F.3d 801, 808 (2001).  In Willis v. Henderson, an African American post office employee filed a complaint after his coworkers called him a monkey and a communist, bragged about their affiliation with militia groups and the KKK, and continued to make derogatory remarks about him after he complained.  Id. at 803-05.  The employee also found a racist cartoon at his workstation, which prompted him to take a leave of absence.  Id. at 805.  He consulted a psychologist, who diagnosed him with depression and anxiety.  Id. at 806.

In Willis, the Eighth Circuit affirmed the district court's determination that these circumstances, although subjectively distressing to the plaintiff, were not sufficiently severe or pervasive as to alter the terms, conditions, or privileges of employment when viewed under an objective standard.  The court noted that the employee "never meaningfully returned to work after the [cartoon] incident."  Id. at 809.  As for the "unpleasant conduct and rude

comments" directed at Willis by his coworkers, the Eighth Circuit noted that "Title VII is 'not designed to create a federal remedy for all offensive language and conduct in the workplace' nor can we, under the auspices of Title VII, 'impose a code of workplace civility.' " Id. at 809-10 (citing Scusa v. Nestle U.S.A. Co., 181 F.3d 958, 967 (8th Cir. 1999)).

### a.    Subjective Standard

Viewed subjectively, the unwelcome harassment Ms. Rosane experienced did affect a term, condition, or privilege of her employment.  Ms. Rosane was meeting her employer's expectations.  Docket No. 57 at 11.  She believed, however, that Ms. Conroy and Mr. Plenty Wounds' unwelcome harassment was so severe that she could not return to work.  When she overheard them planning to report a derogatory remark allegedly made by Mr. or Ms. Rosane to a supervisor, she vomited, became upset, and left work early.  Docket No. 56-4 at 67:19-68:1.  Ms. Rosane requested to remain on sick leave due to anxiety and submitted slips from her nurse practitioner.  See Docket Nos. 56-15; 56-16; 56-20.  The School District later granted Ms. Rosane's request for leave without pay until she wanted to return to work or the investigation was completed.  See Docket No. 64-10.  The court finds that Ms. Rosane has established that her work environment was subjectively severe or pervasive enough to her that it affected a term or condition of her employment.

### b.    Objective Standard

However, establishing that the standard was subjectively met is not enough.  Ms. Rosane must also show that the conduct was objectively severe or pervasive.  That is, conditions were such that a reasonable person in Ms. Rosane's place would have found the conditions so severe or pervasive that a term or condition of her employment was affected.

"Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment–an environment that a reasonable person would find hostile or abusive–is beyond Title VII's purview." <u>Woodland</u>, 302 F.3d at 843.  It is evident that Ms. Rosane's case is distinguishable from <u>Ross</u> and <u>Bowen</u> based on the frequency and severity of the alleged statements.  "[I]solated incidents (unless extremely serious) will not amount to discriminatory charges in the 'terms and conditions of employment.' " <u>Ross v. Kansas City</u>, 293 F.3d at 1051 (citing <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998)).  Additionally, in contrast to the unwelcome harassment in <u>Bowen</u>, Ms. Conroy and Mr. Plenty Wounds did not threaten Ms. Rosane with physical harm.  Like in <u>Willis</u>, Ms. Rosane can meet the subjective but not objective standard.

Looking at factors such as the frequency, severity, threatening nature of the conduct, and inference with work performance, Ms. Rosane's work environment was not objectively hostile or abusive enough so as to have

affected a term, condition, or privilege of her employment. A journal she kept in which she documented incidents at work that bothered her show that from the time she began employment (either 2006 or 2007), until the spring of 2009, there were only three incidents documented, and none had to do with racial overtones. <u>See</u> Docket No. 56-9, page 1. From April 16, 2009, until July 13, 2009, there were only two incidents documented by Ms. Rosane which had racial overtones. <u>Id.</u> at 1-2.

July 14, 2009, was the day that the "F—g Indians" discussion was had. <u>Id.</u> at 2. The atmosphere between Ms. Rosane and Ms. Conroy and Mr. Plenty Wounds clearly became more unpleasant and strained after this discussion. Even after this, however, the incidents documented by Ms. Rosane were not daily. She documented that Ms. Conroy and Mr. Plenty Wounds spoke Lakota around her on 11 separate days between July 16, 2009, and September 8, 2009. <u>Id.</u> Numerous instances are documented where Ms. Conroy gave Ms. Rosane "the silent treatment." The court does not take Ms. Rosane's journal to be determinative of the facts of Ms. Rosane's hostile work environment claim as the School District argues should be done. However, the journal is illustrative of the types, timing, and severity of the instances of harassment alleged by Ms. Rosane.

As the Eighth Circuit held in <u>Willis</u>, race-based harassment must be so severe or pervasive as to affect a term, condition, or privilege of employment

judged under <u>both</u> an objective and subjective standard.  <u>Willis</u>, 262 F.3d at

808 (emphasis supplied).  Here, the conduct was not severe.  Furthermore, it

was not pervasive enough to have been objectively hostile or abusive, though

the court does not question Ms. Rosane's subjective assertion that she found it

so.  Because Ms. Rosane's work environment was not objectively hostile or

abusive, she has not met the *prima facie* case of hostile work environment.

Accordingly, the court recommends granting defendant's motion for summary

judgment on the hostile work environment claim.

### 3. When Harassment is by a Co-worker, Whether Employer Knew or Should Have Known

If a co-worker, rather than a supervisor, is the instigator of unwelcome

race-based harassment, a plaintiff bringing a hostile work environment claim

must prove that his or her employer knew or should have known of the

harassment and failed to take adequate remedial measures.  <u>See</u> <u>Bowen</u>, 311

F.3d at 883; <u>Woodland</u>, 302 F.3d at 843.  In Ms. Rosane's complaint, she

describes Bertha Conroy and Pete Plenty Wounds as "supervisor/co-workers."

<u>See</u> Docket No. 1 at 2.  If Ms. Conroy and Mr. Plenty Wounds were supervisors,

Ms. Rosane does not need to prove the knew-or-should-have-known element of

the *prima facie* case.  If they were co-workers, she must prove the School

District knew or should have known about the harassment she experienced

and failed to take adequate remedial measures.

Because the court has found that Ms. Rosane has not proved that the harassment was severe or pervasive enough to constitute a hostile work environment, it need not determine whether Ms. Conroy or Mr. Plenty Wounds were supervisors. However, in the event the district court disagrees with that conclusion, the court also provides the following analysis of the supervisor issue.

The Eighth Circuit and a majority of federal courts of appeals have defined supervisor as one who "had the power (not necessarily exercised) to take tangible employment action against the victim, such as the authority to hire, fire, promote, or reassign to significantly different duties." Joens v. John Morrell & Co, 354 F.3d 938, 940 (8th Cir. 2004) (adopting the majority definition and noting that the "decisions of the few circuits to address the question ['who is a supervisor'] are not entirely consistent"). Ms. Rosane urges this court to consider Vance v. Ball State University, pending before the Supreme Court this term. See Docket No. 62 at 16 (citing Brief for Petitioner, Vance v. Ball State Univ., __ U.S. ___, 133 S.Ct. 23 (2012) (No. 11-556), 2012 WL 3803439. The plaintiff in Vance challenges the majority definition of "supervisor," urging the Supreme Court to adopt a less rigorous definition ("those whom the employer vests with authority to direct and oversee [ ] daily work"). 2012 WL 3803439 at *14-*18 (see also "Question Presented").

Existing Eighth Circuit case law defines a supervisor as one who can take "tangible employment action." Joens, 354 F.3d at 940. For example, a "team leader" who can "assign employees to particular tasks" is not a supervisor. Merritt v. Albemarle Corp., 496 F.3d 880, 883 (8th Cir. 2007) (citing Weyers v. Lear Oper. Corp., 359 F.3d 1049, 1057 (8th Cir. 2004). Similarly, the Eighth Circuit held that a construction foreman who may have consulted with a supervisor regarding tangible employment actions but lacked the authority to make such decisions himself was not a supervisor. Cheshewalla v. Rand & Son Const. Co., 415 F.3d 847, 851 (8th Cir. 2005). Under the Eighth Circuit definition, neither Ms. Conroy nor Mr. Plenty Wounds were supervisors because they could not take "tangible employment action" against Ms. Rosane. Joens, 354 F.3d at 940.

However, the plaintiff in Vance is asking the Supreme Court to expand the definition of "supervisor" to include those persons who oversee the day-to-day work of the plaintiff, though they may not have the power to hire or fire. Under this alternative definition (which the Supreme Court may or may not adopt), Ms. Rosane argues that Ms. Conroy, the head cook, was her supervisor because she had the ability to direct Ms. Rosane's duties as well as provide input for performance evaluations. See Docket No. 62 at 16-17.

In her deposition, Ms. Rosane confirms that her supervisors were Connie Kaltenbach (the school principal) and Carol Reitz. See Docket No. 56-4 at

96:4-7.  According to Michael Brubaker, the Shannon County Classified

Education Association representative, "Bertha [Conroy] believed . . . herself to

be the supervisor to anyone and everyone who walked into that kitchen."  See

Docket No. 64-6 at 18:3-9.  Ms. Rosane argues that this disputed issue is one

of fact for the jury.

      The court notes that this court is bound by existing Eighth Circuit

precedent.  Under that precedent, Ms. Conroy and Mr. Plenty Wounds are not

supervisors.  The court cannot analyze an alternative standard that the

Supreme Court may or may not adopt for the simple reason that that standard

is as of yet unknown.  The best this court can do at present is no more and no

less than its duty:  to determine what existing binding precedent is and apply it

to the facts of the case before it.  This, the court has done.

### 4.    Affirmative Defense

      When an employee is the subject of a hostile work environment caused

by her supervisor, the employer is vicariously liable for the harassment.  See

Faragher v. Boca Raton, 524 U.S. 775, 807-08 (1998); Burlington Indus., Inc.

v. Ellerth, 524 U.S. 742, 764-65 (1998).  There is, however, an affirmative

defense to this otherwise automatic liability:  if no adverse employment action

occurred, an employer may avoid liability by showing that the employer

exercised reasonable care to prevent and promptly correct any harassing

behavior and the employee unreasonably failed to take advantage of any

31

preventive or corrective opportunities provided by the employer. <u>Faragher</u>, 524 U.S. at 807-08; <u>Ellerth</u>, 524 U.S. at 764-65. The parties discuss whether the affirmative defense to hostile work environment described in <u>Ellerth</u> and <u>Faragher</u> applies in this case.

The court need not engage in that analysis. The affirmative defense only applies in cases where the harassment is conducted by a supervisor and no adverse employment action has occurred. <u>Faragher</u>, 524 U.S. at 807-08; <u>Ellerth</u>, 524 U.S. at 764-65. Here, the court has concluded that the harassment was conducted by co-workers, not supervisors, and there clearly was an adverse employment action taken. (Ms. Rosane was fired and, although the motivation for her termination is disputed, the fact of her termination is not). Thus, the affirmative defense cannot apply in this case because the harassment was perpetrated by co-workers and because the School District implemented an adverse employment action. Should this court be wrong about whether Ms. Rosane has made out a *prima facie* case of harassment, and also wrong about Ms. Conroy's status as a co-worker, and also wrong about whether an adverse employment action occurred, the affirmative defense would come into play and would have to be analyzed.

**D.    Plaintiff's Retaliation Claim**

**1.    _McDonnell Douglas_ Burden-Shifting Framework**

To defeat summary judgment on a retaliation claim, a plaintiff must present direct evidence of unlawful retaliation or create such an inference under <u>McDonell Douglas</u> burden-shifting framework.  <u>Pye</u>, 641 F.3d at 1020 (citing <u>Young-Losee v. Graphic Packaging Int'l, Inc.</u>, 631 F.3d 909, 912 (8th Cir. 2011)).  Direct evidence "demonstrates a specific link between a materially adverse action and the protected conduct, sufficient to support a finding by a reasonable trier of fact that the harmful adverse action was in retaliation for the protected conduct."  <u>Id.</u>  Ms. Rosane does not assert direct evidence of retaliation.  <u>See</u> Docket No. 62.  Accordingly, the issue becomes whether plaintiff has presented "an inference of retaliation under the <u>McDonnell Douglas</u> burden-shifting framework."  <u>Pye</u>, 641 F.3d at 1020.

The burden-shifting framework in Title VII cases, derived from <u>McDonnell Douglas Corp. v. Green</u>, consists of three steps.  <u>Id.</u> at 1021; <u>Guimares v. SuperValu, Inc.</u>, 674 F.3d 962, 978 (8th Cir. 2012); <u>see generally</u> <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  First, plaintiff must establish a _prima facie_ case of her claim.  <u>Pye</u>, 641 F.3d at 1021.  Next, defendant has the opportunity to offer a non-retaliatory reason for its action. <u>Id.</u>  Finally, the plaintiff has the opportunity to prove that defendant's stated non-retaliatory reason was merely pretext.  <u>Id.</u>

## 2.    *Prima Facie* **Case of Retaliation**

Title VII prohibits retaliation by an employer against an employee "because [s]he has opposed any practice made an unlawful employment practice by [Title VII], or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." Id. at 1020 (citing 42 U.S.C. § 2000e-3(a)).  To establish a *prima facie* case of retaliation, the employee must establish that (1) she engaged in protected conduct, (2) she suffered a materially adverse employment action, and (3) a causal link exists between the adverse action and the protected conduct.  Id. at 1021.

### a.    **Protected Activity**

Ms. Rosane satisfied the first element by filing her internal grievance and by filing her charge of discrimination with the SDDHR, which are both protected activities under Title VII.  Id. at 1020.  The School District argues that Ms. Rosane did not engage in protected activity prior to filing her charge of discrimination in October, 2009, with the SDDHR.  This argument is disingenuous.

Ms. Rosane alleged that she was being discriminated against in the workplace in her grievance of September 18, 2009.  While she did not specifically reference race, she was alleging that Ms. Conroy, a female, and Mr. Plenty Wounds, a male, were the ones discriminating against her.  That

fact, coupled with her allegations about the use of Lakota as a tool of exclusion, could lead one to infer that race was the basis of Ms. Rosane's allegations.

Indeed, the School District appears to have accurately understood that Ms. Rosane was alleging a hostile work environment claim. In a written response to her grievance dated September 28, 2009, the School District wrote that it concluded that the use of Lakota in Ms. Rosane's work environment was not being deployed in an attempt to harass, bully, or discriminate against Ms. Rosane. The later SDDHR charge–filed approximately one month later-- was explicit in its reliance on race as the basis of Ms. Rosane's discrimination allegation. The court concludes that Ms. Rosane has adduced enough evidence to show that she engaged in protected activity sufficient to survive summary judgment on this element.

### b. Materially Adverse Employment Action

In the retaliation context, the Eighth Circuit has noted: "[a]dverse employment action is exhibited by a material employment disadvantage, such as a change in salary, benefits, or responsibilities." Williams v. City of Kansas City, 223 F.3d 749, 753 (8th Cir. 2000). Viewing the facts, and inferences from those facts, in the light most favorable to the nonmoving party on this summary judgment motion, Ms. Rosane's termination from School District, whether she felt forced to resign or was terminated, constitutes an adverse employment action.

This court expresses no opinion as to whether the proposed transfer constituted an adverse employment action as the transfer did not occur. In response to defendant's statement "Plaintiff was not transferred to Wolf Creek School," Ms. Rosane responded: "Admit that the transfer initiated by the District did not come to fruition." Docket No. 67 ¶ 11. Ms. Rosane knew this when she filed her charge with the SDDHR. See Docket No. 56-23 at 2 (charged was filed October 14 and she had declined the transfer on October 6). "A transfer constitutes an adverse employment action when the transfer results in a significant change in working conditions or a diminution in the transferred employee's title, salary, or benefits." Turner v. Gonzales, 421 F.3d 688, 697 (8th Cir. 2005) (citing Fisher v. Pharmacia & Upjohn, 225 F.3d 915, 919 (8th Cir. 2000)). The proposed transfer would have increased Ms. Rosane's commute, but it is not clear that the transfer would have significantly changed her working conditions. Even if the transfer would have resulted in a significant change, Ms. Rosane agrees that the transfer did not occur.

### c. Causation

Causation is the crux of the disagreement between the parties on Ms. Rosane's retaliation charge. The School District argues that this court should find that the time period between the filing of the grievance (on September 18, 2009) and Ms. Rosane's termination (in April 2010) precludes a finding that her termination was causally related to filing her grievance. "As

more time passes between the protected conduct and the retaliatory act, the inference of retaliation becomes weaker and requires stronger alternate evidence of causation.  The inference vanishes altogether when the time gap between the protected activity and the adverse employment action is measured in months. ”  Tyler v. Univ. of Arkansas Bd. of Trustees, 628 F.3d 980, 986 (8th Cir. 2011); Littleton v. Pilot Travel Ctrs., LLC, 568 F.3d 641, 645 (8th Cir. 2009) (temporal gap of seven months “not sufficiently contemporaneous” to indicate a causal connection); Recio v. Creighton Univ., 521 F.3d 934, 941 (8th Cir. 2008) (a six-month gap too long to give rise to inference of causation); Lewis v. St. Cloud State Univ., 467 F.3d 1133, 1138 (8th Cir. 2006) (interval as brief as two months did not show causation for purposes of establishing a retaliation claim).

The court notes that Ms. Rosane filed her grievance with the School District on September 18, 2009, and that was the first time she used the term “discrimination.”  The subject of her transfer to the other school was raised on September 24, 2009, just a few days later.  In addition, the SDDHR issued its finding of no probable cause on February 11, 2010, which Ms. Rosane then appealed to the EEOC.  The School District fired Ms. Rosane just a matter of weeks after that event.

In addition to temporal proximity between protected activity and adverse employment action, a plaintiff can use alternate circumstantial evidence to

prove causation--generally more than timing is required.  Bainbridge v.

Loffredo Gardens, Inc., 378 F.3d 756, 762 (8th Cir. 2004) (internal citations

omitted).  For example, as an alternative to inferring causation from timing,

courts compare the employer's satisfaction with the employee's performance

prior to and after engaging in protected activity.  "A causal link between an

employee's conduct and her termination may be shown if the retaliation

occurred soon after the employee's protected conduct or if the employer's

concerns about the employee's conduct arose only after the employee engaged

in protected conduct."  Johnson v. Shinseki, No. 4:08CV1872, 2011 WL

3703277 (E.D. Mo. Aug. 23, 2011) (holding genuine issue of material fact

precluded summary judgment where employer took no disciplinary action

during employee's first ten years on the job, but after employee filed grievance,

employer frequently reprimanded, failed to promote, and eventually terminated

employee over one year after she filed complaint); see also Pye, 641 F.3d at

1021 ("there is no evidence that [employer] had any concerns regarding

[employee's] performance before he engaged in protected conduct").

    In the recent case Guimaraes v. SuperValu, Inc., the Eighth Circuit

affirmed the district court's grant of summary judgment on an employee's

retaliation claim where the employer had concerns about the employee's

performance before any grievance was filed.  Guimaraes, 674 F.3d at 980.  The

court noted that "the employer had been concerned about a problem before the

employee engaged in the protected activity." Id. at 978 (citing Wierman v. Casey's Gen. Stores, 638 F.3d 984, 1001 (8th Cir. 2011). Because the employer could demonstrate concerns with the employee's performance arising prior to the filing of her complaint, the employee could not prove that the employer's stated reason for terminating her--her performance--was pretextual. Id. In contrast to the plaintiff in Guimaraes, Ms. Rosane was meeting her employer's expectations. Docket No. 57 at 11. School District has not provided any evidence that Ms. Rosane was the subject of any disciplinary action prior to filing her grievance.

Ms. Rosane argues that the reason for her termination was pretextual. She argues that she was not terminated due to her employment at Gordon Hospital, but rather in retaliation for filing a grievance. She alleges that she contacted the School District on January 19, 2010, and March 25, 2010, to inquire about the status of the School District's investigation of her complaints and that she never received a response. See Docket No. 62 at 26; Docket No. 64-11. Ms. Rosane began work at Gordon Hospital on January 22, 2010. Docket No. 56-4 at 112:12-15. In the letter dated April 1, 2010, explaining the recommendation to the School Board that Ms. Rosane be terminated, School District stated "we are concerned about the implication that you received benefits for over three (3) months at a cost to the School District when you

were, in fact, able and willing to work and did work at other facilities."

Docket No. 56-29.

While this argument of pretext implicates the second and third steps of burden-shifting analysis, it does raise an issue of material fact. "A case may be taken from the jury only when there is no genuine issue of material fact . . . . Evaluative judgment between two rationally possible conclusions from facts cannot be engaged in on summary judgment." Minnis v. Int'l. Union, United Auto., Aerospace and Agric. Implement Workers of Am., 531 F.2d 850, 854 (8th Cir. 1975). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Guimaraes, 674 F.3d at 972 (internal citations omitted). Here, a jury could arrive at two rationally possible conclusions regarding causation.

A reasonable jury could conclude that Ms. Rosane contacted the School District on January 19, 2010, as one last effort to understand the status of her employment and the pending investigation and when she received no response, she sought to mitigate her damages by accepting employment at Gordon Hospital. A reasonable jury could alternatively conclude that Ms. Rosane knew she was still employed by the School District and that she misrepresented her health situation in order to receive benefits from the School District while working for Gordon Hospital. This credibility determination is not one for the court to make. Because a genuine issue of material fact exists as to the School

District's motives for terminating Ms. Rosane, the court recommends denying the School District's motion for summary judgment as the retaliation claim.

### 2. School District's Stated Non-retaliatory Reason

School District offers the non-retaliatory reason for termination "that [Ms. Rosane] had been employed elsewhere for several months, while remaining an employee of District on long-term leave, continuing to receive benefits." See Docket No. 66 at 16.

### 3. Whether Asserted Non-retaliatory Reason was Mere Pretext

In the summary judgment context, a plaintiff can establish a genuine issue of material fact exists if the employer's explanation has "no basis in fact" or if the plaintiff "can 'directly' persuade the court that a 'prohibited reason more likely motivated the employer.'" Anderson v. Durham, 606 F.3d 513, 521 (8th Cir. 2010) (citing Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1120 (8th Cir. 2006)). As discussed above, the same dispute as to the causation element necessarily implicates the pretext inquiry. Because a genuine dispute exists regarding the *prima facie* case, this court will not consider the final stage of the McDonnell Douglas analysis.

### E. Sovereign Immunity Under South Dakota Law

The School District asserts sovereign immunity as an affirmative defense. See Docket No. 57 at 27. The School District cannot assert immunity under Eleventh Amendment. The Eighth Circuit noted that the "plain language" of

Title VII "demonstrates Congress' intent to abrogate Eleventh Amendment immunity of the states in this area."  Okruhlik v. Univ. of Arkansas ex rel. May, 255 F.3d 615, 623 (8th Cir. 2001).  Because the School District has been denied insurance coverage on this matter, School District urges this court to apply South Dakota law to grant summary judgment on the basis of statutory sovereign immunity.  See Docket No. 57 at 27.

South Dakota law provides:  "Except insofar as a public entity participates in a risk sharing pool or insurance is purchased pursuant to § 21-32A-1, any public entity is immune from liability for damages whether the function in which it is involved is governmental or proprietary.  The immunity recognized herein may be raised by way of affirmative defense."  SDCL § 21-32A-3.  The School District argues:  "Insurance coverage does not exists; hence, there is no waiver of sovereign immunity."  Docket No. 57 at 29.

Plaintiff resists this assertion of statutory sovereign immunity. "Municipal defenses–including an assertion of sovereign immunity–to a federal right of action are, of course, controlled by federal law.  Owen v. City of Independence, Missouri, 445 U.S. 622, 647 n.30 (1980).  Plaintiff draws a persuasive analogy between § 1983 and Title VII remedies:  "Accordingly, we have held that a state law that immunizes government conduct otherwise subject to suit under § 1983 is preempted, even where the federal civil rights litigation takes place in state court, because the application of the state

immunity law would thwart the congressional remedy." <u>Felder v. Casey</u>, 487 U.S. 131, 139 (1988).

When enacting and later amending Title VII, Congress "held extensive hearings and received numerous reports detailing racial and gender discrimination by the states." <u>Okruhlik</u>, 255 F.3d at 625. Allowing South Dakota state law to preempt Title VII provisions which subject state employers to employment discrimination lawsuits would thwart the underlying purpose of Title VII. Accordingly, this court recommends denying relief to School District under the affirmative defense of statutory sovereign immunity.

## CONCLUSION

Based on the facts and law discussed above, this court respectfully recommends that the School District's motion for summary judgment [Docket No. 56] be granted in part and denied in part as follows:

1.    this court recommends granting defendant summary judgment on plaintiff's hostile work environment claim;

2.    this court recommends denying defendant summary judgment on plaintiff's retaliation claim; and

3.    this court recommends denying defendant summary judgment on its claim of sovereign immunity.

**NOTICE OF RIGHT TO APPEAL**

The parties have fourteen (14) days after service of this Report and Recommendation and Order to file written objections pursuant to 28 U.S.C. § 636(b)(1)(B), unless an extension of time for good cause is obtained. See Fed. R. Civ. P. 72(b). A party may respond to another party's objections within 14 days of being served with a copy. Id. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Id. Objections must be timely and specific. Timely, specific objections to the findings and conclusions will be reviewed *de novo* by the District Court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

Dated March 5, 2013.

BY THE COURT:

/s/ *Veronica L. Duffy*

VERONICA L. DUFFY
UNITED STATES MAGISTRATE JUDGE